STATE OF CONNECTICUT *v.*
LUIS M. RODRIGUEZ
(SC 20372)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

Convicted, after a jury trial, of sexual assault in the first degree and criminal
     attempt to commit sexual assault in the first degree, the defendant
     appealed. The defendant's conviction stemmed from an incident in which
     two Hispanic men pulled a woman, who was walking on a street in
     New Britain, into the backseat of their car and sexually assaulted her.

* The listing of justices reflects their seniority status on this court as of
the date of oral argument.

State *v.* Rodriguez

Approximately ten years after the incident, the defendant became a person of interest based on a match between the DNA sample that had been extracted from the victim's sexual assault evidence kit and a sample of the defendant's DNA that had been placed into a database at some point after the victim's assault. The police interviewed the defendant, and he denied that the incident in question occurred but consented to the taking of a buccal swab, which the police submitted to the state forensic laboratory for analysis. The laboratory subsequently reported a match between the DNA from the defendant's buccal swab and that taken from the victim's sexual assault evidence kit, and the police interviewed the defendant again. During the second interview, the defendant admitted that he did have a threesome after he picked up a man and a woman near an automobile parts store. At trial, three laboratory reports analyzing the DNA samples were introduced into evidence through the testimony of P, a forensic science examiner with the state forensic laboratory. The first of the three reports was produced in 2007 and described the results of the victim's sexual assault evidence kit. The second and third reports were produced in 2016 and were based on comparisons of the DNA samples from the sexual assault evidence kit and the defendant's buccal swab. P testified regarding the procedures used to test the DNA evidence and the results contained in the three reports. The third and final report analyzed the sperm-rich and epithelial-rich fractions of the vaginal, oral and genital swabs, including a 2016 reworking of the sperm-rich fraction of the vaginal swabs, and the defendant's buccal swab. That report concluded that the defendant was a potential contributor to the DNA profile from the sperm-rich fraction of the vaginal swabs and that the expected frequency of individuals who could be a contributor to that DNA profile was approximately 1 in 230,000 in the Hispanic population. On appeal from the judgment of conviction, the defendant claimed, inter alia, that the trial court had violated his right to confrontation by allowing P to testify about the results of the DNA identification analysis without requiring testimony from the individual who generated the DNA profiles. *Held*:

1. The defendant's unpreserved claim that the trial court violated his right to confrontation failed under *State* v. *Golding* (213 Conn. 233) because it was unclear whether the 2016 retesting of the vaginal swab was performed by someone other than P, and, therefore, the record was inadequate to establish whether a violation of the defendant's right to confrontation occurred.

2. The defendant could not prevail on his unpreserved claim that his due process right was violated by the introduction of DNA identification evidence that was unreliable: the defendant failed to establish a constitutional violation under *Golding* because the jury was presented with evidence that there was a genetic profile match and the statistical rarity of the match, P explained the statistical method she used to determine the rarity of the match, and defense counsel had the opportunity to cross-examine P, present his own statistical evidence, or request a jury

State *v.* Rodriguez

instruction; moreover, this court declined the defendant's invitation to exercise its supervisory authority to require trial courts to instruct juries on the meaning of random match probability when DNA evidence is the only evidence identifying the defendant as the perpetrator.

3. There was no merit to the defendant's claim that a random match probability of 1 in 230,000 in the Hispanic population, by itself, was insufficient to prove that he was guilty beyond a reasonable doubt; the evidence establishing the identity of the defendant was not based on DNA evidence alone, as the video recordings of the defendant's two interviews with the police, which were played for the jury and which included inconsistent statements that indicated the defendant's consciousness of guilt, provided additional evidence to establish the defendant's guilt beyond a reasonable doubt.

*(One justice concurring separately)*

Argued December 19, 2019—officially released September 24, 2020**

*Procedural History*

Substitute information charging the defendant with two counts of the crime of sexual assault in the first degree and one count of criminal attempt to commit sexual assault in the first degree, brought to the Superior Court in the judicial district of New Britain and tried to the jury before *Dewey, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Brian W. Preleski*, state's attorney, and *Brett J. Salafia*, senior assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. The defendant, Luis M. Rodriguez, appeals from the judgment of conviction, rendered after a jury trial, of two counts of sexual assault in the first degree and one count of criminal attempt to commit sexual assault in the first degree. The defendant claims

_____

** September 24, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Rodriguez

that (1) the trial court violated his right to confrontation, as articulated in *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), by allowing a laboratory analyst to testify about the results of a DNA identification analysis without requiring testimony from the individual who generated the DNA profiles, (2) his due process right was violated by the introduction of DNA identification evidence that was unreliable under *Manson* v. *Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), because of the danger that the jury would not understand the meaning of random match probability, and (3) the evidence is insufficient to sustain his conviction. We disagree and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. In the early morning, the victim[1] was walking from her residence on Martin Luther King Drive in New Britain to a nearby convenience store. Near Lafayette and Beaver Streets, a gold, four door sedan with two male occupants stopped and asked the victim if she knew where they could buy cocaine. The victim told the men that she did not know, and they drove away. Less than five minutes later, the men returned, and one of them pulled the victim into the backseat with him. After driving for between ten and fifteen minutes, the vehicle stopped at an abandoned housing complex. The driver got into the backseat, and the victim sat between the two men. The victim testified that both men were Hispanic, one man "was kind of thin and the other one was kind of heavy," and both spoke Spanish to each other during the attack.

After the men removed, or had the victim remove, her clothing, "[t]hey started putting their fingers . . . [i]nto [her] vagina" against her will. The thin man

_____

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

State *v.* Rodriguez

engaged in forcible penile-vaginal intercourse with the
victim, made her perform oral sex on him, and "was
pretty much done with [her] within probably about five
minutes . . . ." The heavier man could not maintain
an erection, and he forced the victim to perform oral sex
and forcibly digitally penetrated her vagina. Thereafter,
the heavier man pulled the victim out of the car by her
hair and ejaculated while "rubbing his penis up against
the inside of [the victim's] thigh."

After the assault, the two men drove away, and the
victim "walked quite a ways" and came upon a house.
The occupant of the house, Juanita Isaacs, testified that
the victim banged on her door and asked Isaacs for
help, telling her that she had been raped. Isaacs called
the police, Officer Alan Vincent Raynis, Jr., of the New
Britain Police Department responded, and the victim
told him what happened. Raynis took the victim back
to the scene of the crime, where he took several photo-
graphs and seized a pair of jeans, a sports brassiere,
and panties.

The victim was transported to New Britain General
Hospital, where she was examined, and a sexual assault
evidence kit was processed. The examining nurse swabbed
the victim's vaginal and oral cavities, the exterior sur-
face of her genitalia, and her inner thigh to collect any
biological material that could be used to identify the
perpetrators. Raynis collected the kit and submitted it
to the state forensic laboratory for analysis. Thereafter,
the victim provided the police with a sworn, written
statement regarding the incident.

The laboratory staff found sperm in the vaginal smear
and genital swabs. The staff did not find sperm on the
oral sample, but other tests revealed the presence of
human seminal fluid protein. The laboratory staff
extracted DNA from the evidentiary materials and
searched it against DNA contained in the Combined

State *v.* Rodriguez

DNA Index System (CODIS).[2] No matching profiles were found.

Approximately ten years later, the defendant became a person of interest in the sexual assault based on a CODIS match between the evidentiary DNA sample that had been extracted from the victim's sexual assault evidence kit and a sample of the defendant's DNA that had been placed into CODIS at some point after the victim's assault. In August, 2016, a detective from the New Britain Police Department interviewed the defendant. The detective informed the defendant that he was a suspect in a sexual assault involving two men and a woman. The defendant denied having had sex in a threesome, which he described as disgusting, and said he did not allow women in his car. The defendant also described to the police vehicles that he previously owned, which did not include a gold, four door sedan, and informed the police that he currently did not have any car registered in his name. The defendant then consented to the taking of a buccal swab, which the police submitted to the laboratory for analysis.

Several months later, the laboratory reported a match between the DNA from the defendant's buccal swab and that taken from the victim's sexual assault evidence kit. In December, 2016, the police again spoke with the defendant. The detective informed the defendant that his DNA was found in the vaginal sample from the victim. Contrary to his previous statement to the police, the defendant admitted that he did have a threesome on two occasions in hotels in Plainville and on the Berlin Turnpike. He stated that one incident involved a "skinny, Puerto Rican" girl and occurred when he picked up a man and a woman near an AutoZone store and dropped them off at a store on Broad Street in New

_____

[2] CODIS contains DNA profiles from unsolved crimes and compares them to known samples from convicted felons that are periodically added to the database. See, e.g., *State* v. *Webb*, 128 Conn. App. 846, 852–53 n.3, 19 A.3d 678, cert. denied, 303 Conn. 907, 32 A.3d 961 (2011).

State *v.* Rodriguez

Britain. The detective also informed the defendant that, in addition to the assault, the victim complained of being robbed of several hundred dollars, and the defendant replied with words to the effect of: "That's not me. It's the other guy."

The defendant was arrested and charged in the operative information with two counts of sexual assault in the first degree and one count of criminal attempt to commit sexual assault in the first degree. The trial commenced in March, 2018. At trial, three laboratory reports analyzing the DNA samples were introduced into evidence through the testimony of Angela Przech, a forensic science examiner with the laboratory, whose testimony and related evidence are the subject of the defendant's confrontation and due process claims. First, the state introduced a laboratory report dated November 26, 2007, that describes the results of the sexual assault evidence kit. The report indicates that the laboratory tested the vaginal, oral, and genital swabs, and it states that the material on the swabs was divided into sperm-rich and epithelial-rich fractions, all of which yielded DNA.[3] The report further states that item number 1E, the oral swabs, and item number 1I, the genital swabs, "were consumed in testing," and that the balance of item number 1C, the vaginal swabs, "was retained in the laboratory." The report notes that the extracted DNA profiles of item numbers 1I and 1C were entered into CODIS for comparison and no matches were reported at the time the report was issued. The report was signed by Przech and Melanie G. Ktorides, a forensic science examiner.

Second, over the state's relevance objection, the defendant introduced into evidence an unofficial laboratory report dated September 12, 2016, which was

_____

[3] Because it is preferable to analyze a profile of the semen sample alone, Przech explained that, before the DNA is separated from the samples, the epithelial—or skin—cells are separated from the sperm cells.

State *v.* Rodriguez

marked "DNR" for "do not report" and was never officially released. It indicates that the laboratory tested the sperm-rich and epithelial-rich fractions of the vaginal, oral and genital swabs, as well as the defendant's 2016 buccal swab. The unofficial report concluded that the defendant "is included as a potential contributor to the DNA profile" from the sperm-rich fraction of the vaginal swabs. It states that the "expected frequency of individuals who could be a contributor to the DNA profile . . . from [the sperm-rich fraction of the vaginal swabs] is . . . approximately 1 in 4.9 in the Hispanic population."[4] The report was signed by Przech, as the analyst, and a technical reviewer.

Finally, the state introduced a laboratory report dated December 16, 2016. Similar to the September, 2016 report, the December report analyzed the sperm-rich and epithelial-rich fractions of the vaginal, oral and genital swabs, as well as the defendant's 2016 buccal swab. It also added three new items of evidence to the list, including "[item number] 1C [v]aginal [s]wabs," and noted that this item had been separated into sperm-rich and epithelial-rich fractions. The report concluded that the sperm-rich fraction of the vaginal swabs was a mixture, and the defendant "is included as a potential contributor to the DNA profile . . . ." Unlike the September, 2016 report, however, the December, 2016 report concluded that the "expected frequency of individuals who could be a contributor to the DNA profile . . . from [the sperm-rich fraction of the vaginal swabs] is . . . approximately 1 in 230,000 in the Hispanic population."[5] The report was again signed by Przech, as the analyst, and a technical reviewer.

_____

[4] The unofficial report also concludes that the expected frequency of individuals who could be a contributor to the DNA profile from the sperm-rich fraction of the vaginal swabs is "approximately 1 in 4.9 in the [African-American] population" and "approximately 1 in 3.3 in the Caucasian population . . . ."

[5] The December, 2016 report also concludes that the expected frequency of individuals who could be a contributor to the DNA profile from the sperm-

State *v.* Rodriguez

At trial, Przech testified regarding the procedures used to test the DNA evidence and the results contained in her three reports. Specifically, she testified that, in 2007, the laboratory used a DNA testing kit called Identifiler to develop the DNA profiles from the sexual assault evidence kit and produced the November, 2007 report. She explained that the laboratory had successfully separated sperm cells from epithelial cells in the various evidentiary samples.

Przech further testified that, in 2016, the New Britain Police Department submitted a known buccal swab of a suspect in the case to the laboratory for comparison with the evidentiary DNA that had been extracted in 2007. She explained that, rather than having an analyst physically process the defendant's buccal swab, the laboratory processed it via "an automated procedure" in which "a robot" extracts and processes DNA from the known buccal sample. Przech compared the defendant's DNA profile to the profiles that had been extracted from the evidentiary swabs in 2007 and concluded that the defendant was a "potential contributor" to the DNA mixture that had been extracted from the sperm-rich fraction of the vaginal swabs.

Przech testified that the December, 2016 report set forth her conclusions regarding the comparison of the defendant's buccal swab and the DNA taken from the sexual assault evidence kit. She explained that, prior to the creation of the December, 2016 report, her technical leader requested that "additional work be done with the sample in order to make sure that there was a fully developed profile, and it was to the standard that was required in 2016 and not the standard that was required in [2007]." Przech clarified that the unofficial report from September, 2016, "is not an official report gener-

___

rich fraction of the vaginal swabs is "approximately 1 in 2.1 million in the [African-American] population" and "approximately 1 in 120,000 in the Caucasian population . . . ."

State *v.* Rodriguez

ated. [These are] case notes within [her] case jacket
that are clearly marked DNR, which is do not report.
. . . No, [this is not an official report]; this is not a
report at all. It never went out. It never went to the
. . . [New Britain Police Department]. So, it's consid-
ered case notes within [her] case jacket.''

On redirect examination, Przech further explained
that the sperm-rich fraction of the vaginal swabs was
''rework[ed]'' in 2016 to comply with contemporary
interpretations of the rules relating to statistical analy-
ses. Przech explained that she ''chose not to issue [the
unofficial, September, 2016] report because the infor-
mation that was there was not complete according to
our rules for 2016 statistic[al] [data] generation,'' which
required taking into account ''many different parts of
the profile that we didn't have to consider in 2007.''
Because there was not a complete profile, the unofficial,
September, 2016 report did not give ''the whole story,''
and Przech's technical leader requested that the sperm-
rich vaginal swab be ''amplified more and [Przech] can
develop a different profile and get better results. [The]
sample that [Przech] had in 2007 wasn't complete.''
Przech reworked the sample using a new kit, called
Identifiler Plus, which was more sensitive than the ear-
lier kit to degraded DNA and also to inhibitors, such
as bacteria, that could be found in a sample. Finally,
she explained that ''the [September, 2016] report that
was DNR, that never went out, that sample for [item
number] 1CB [the sperm-rich fraction of the vaginal
swabs] was a different profile than the one that was
issued [i]n [the December, 2016 report] . . . . So, they
are two different profiles.''

Following the trial, the jury found the defendant
guilty on all counts. The defendant was sentenced to a
total effective sentence of thirty years incarceration.
He appealed from the judgment of conviction to the
Appellate Court, and the appeal was transferred to this
court. Additional facts will be set forth as necessary.

State *v.* Rodriguez

I

We first consider the defendant's claim that the trial court violated his right to confrontation, as articulated in *Crawford* v. *Washington*, supra, 541 U.S. 36, by allowing Przech to testify about the results of the DNA identification analysis without requiring testimony from the individual who generated the DNA profiles. Specifically, the defendant contends that, during questioning about the disparate statistical results presented in the two 2016 reports, Przech testified that she did not conduct the testing underlying those reports. Rather, the defendant argues, Przech used the unnamed analyst's data to deduce the characteristics and sources of the DNA profiles. The defendant concedes that he did not preserve this claim properly at trial and seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[6] The state contends that the record is inadequate to establish factually whether a confrontation right violation occurred. We agree with the state.[7]

At the outset, we note that the defendant's claim is not based on any of the 2007 testing because, as the defendant acknowledges, "Przech did not use the testing in 2007 of the . . . vaginal sample to identify the defendant

_____

[6] *Golding* provides that a defendant may prevail on an unpreserved claim when "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding* by eliminating word "clearly" before "exists" and "deprived").

[7] We note that the issues raised in the concurring opinion are beyond the scope of this appeal. Accordingly, we express no opinion on the merits of that opinion.

State *v.* Rodriguez

as the assailant.'' It also is not based on the admission
of the evidence of the DNA profile generated from the
defendant's buccal swab in 2016, which was extracted
in the automated process that Przech described.[8] Finally,
the defendant makes no claim that his confrontation
right was violated by his own admission of the unoffi-
cial, September, 2016 report into evidence. Rather, the
defendant asserts that it is the admission of the DNA
identification evidence contained in the December, 2016
report and Przech's corresponding testimony that vio-
lated his confrontation right because someone other
than Przech performed the 2016 retesting of the vagi-
nal sample.

Because the defendant seeks *Golding* review of this
unpreserved claim, we begin by determining whether
this claim is reviewable. "The first two [prongs of *Gold-
ing*] involve a determination of whether the claim is
reviewable . . . .'' (Internal quotation marks omitted.)
*State* v. *Peeler*, 271 Conn. 338, 360, 857 A.2d 808 (2004),
cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d
110 (2005). Under the first prong of *Golding*, for the

---

[8] In his original brief, the defendant concedes that he does not "dispute
that the analyst who generated the profile from a single source, known
sample, such as a buccal swab from the defendant, may not need to testify.''
Nevertheless, in his reply brief and at oral argument, the defendant attempts
to raise this issue, claiming that the analyst who tested the known buccal
sample from the defendant must testify at trial. We note that Przech's limited
testimony on this point indicated that the buccal swab was processed in
"an automated procedure,'' and, rather than having an analyst physically
process the sample, "a robot actually does it.'' Moreover, as we have repeat-
edly explained, "[i]t is axiomatic that a party may not raise an issue for the
first time on appeal in [his] reply brief. . . . Our practice requires an appel-
lant to raise claims of error in his original brief, so that the issue as framed
by him can be fully responded to by the appellee in its brief, and so that
we can have the full benefit of that written argument. Although the function
of the appellant's reply brief is to respond to the arguments and authority
presented in the appellee's brief, that function does not include raising an
entirely new claim of error.'' (Citations omitted; internal quotation marks
omitted.) *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 197, 982
A.2d 620 (2009). We therefore decline to review the defendant's belated
claim relating to the testing of the known buccal swab.

State *v.* Rodriguez

record to be adequate for review, the record must contain sufficient facts to establish that a violation of constitutional magnitude has occurred. See, e.g., *State* v. *Brunetti*, 279 Conn. 39, 55–56, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). "[W]e will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." *State* v. *Golding*, supra, 213 Conn. 240. As a result, "we will not address an unpreserved constitutional claim [i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred . . . ." (Internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 581, 916 A.2d 767 (2007).

Here, the record is inadequate to establish that the defendant's confrontation right was violated because it is unclear whether the 2016 retesting of the vaginal swab was performed by someone other than Przech.[9] The following testimony suggests that Przech performed the testing herself. On cross-examination, defense counsel twice asked Przech whether "*you* conducted" additional testing of the vaginal sample in 2016. (Emphasis added.) Przech responded "[y]es" both times.[10] On redirect examination, after Przech testified

---

[9] During cross-examination, Przech testified that she did not process the sample or perform the lab work in 2007. This is of no moment because the defendant's claim is not based on the 2007 testing.

[10] "[Defense Counsel]: Okay. Now, we discussed your testing in 200[7]; however, you conducted additional testing and analysis . . . in 2016. Correct?

"[Przech]: Yes.

"[Defense Counsel]: In 2016, you conducted DNA testing of the vaginal, oral [and] genital swabs and compared the DNA profiles on those items to the known profile of [the defendant], correct?

"[Przech]: Yes.

* * *

"[Defense Counsel]: Okay. You were given the known sample in August, [2016], or sometime after August 17, and you issued a report in December, [2016]. You did testing on that sample during that time period. Right?

"[Przech]: Yes.

"[Defense Counsel]: And you documented your results, correct?

"[Przech]: Yes."

State *v.* Rodriguez

about "rework[ing] the sample" in 2016, the prosecutor asked: "[I]s that what *you did* in this case?" (Emphasis added.) Przech replied: "Yes, [item number] 1CB [vaginal sample]." Thereafter, Przech testified that, following the unofficial, September, 2016 report, her technical leader told her that the vaginal sample "can be amplified more and [that she could] develop a different profile and get better results." The prosecutor then asked: "[W]ere *you* able to amplify the sample?" (Emphasis added.) Przech responded: "*I was able to redo the sample* using a new kit that we used." (Emphasis added.) Przech further testified that the December, 2016 report was based on this "redo" of the sample, which resulted in a different DNA profile than the one on which the unofficial, September, 2016 report was based. Defense counsel did not conduct a recross-examination of Przech.

But Przech also testified on cross-examination, without referencing a specific test, that "I was the analyst who analyzed the data. I didn't develop the profiles or do the lab work." In light of this inconsistent testimony, it is, at best, unclear whether someone other than Przech retested the vaginal samples in 2016, and any conclusion we could attempt to draw as to who retested the vaginal samples would be purely speculative. As we have explained, "[i]t is incumbent upon the [defendant] to take the necessary steps to sustain [his] burden of providing an adequate record for appellate review. . . . Our role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claims] would be entirely speculative." (Internal quotation marks omitted.) *State* v. *Brunetti*, supra, 279 Conn. 63. Because it is the function of the trial court, not this court, to make factual findings; see, e.g., *State* v. *Satchwell*, 244 Conn. 547, 562, 710 A.2d 1348 (1998);

337 Conn. 175 JULY, 2021 189

State *v.* Rodriguez

the defendant was required to clarify the record as to whether someone other than Przech conducted the retesting in 2016. Because the facts revealed by the record are inadequate to establish whether the alleged constitutional violation did, in fact, occur, we conclude that the defendant's claim fails under the first prong of *Golding*, and, thus, we decline to review it.

II

We next turn to the defendant's contention that his due process right was violated by the introduction of DNA identification evidence that was unreliable under *Manson* v. *Brathwaite*, supra, 432 U.S. 98, because of the danger that the jury would assume that a random match probability is the likelihood that the defendant is not the source of the DNA in the vaginal sample.[11] The defendant again seeks review of this unpreserved claim under *State* v. *Golding*, supra, 213 Conn. 239–40.[12]

[11] Contrary to the defendant's assertion, *Manson* v. *Brathwaite*, supra, 432 U.S. 98, provides little guidance for assessing DNA evidence. In that case, the United States Supreme Court concluded that "reliability is the linchpin in determining the admissibility" of evidence of an eyewitness identification that results from an unnecessarily suggestive procedure. Id., 114. The court also concluded that the factors to be considered in the analysis of whether the identification evidence is admissible are those set forth in *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). See *Manson* v. *Brathwaite*, supra, 114. These factors include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." Id.

[12] The defendant also appears to contend that we may reverse the judgment on the ground of plain error. The defendant's claim is not briefed beyond a conclusory assertion in a single footnote. He contends, without any analysis, that "[c]onvicting the defendant solely on misunderstood DNA evidence affects the fairness and integrity of and public confidence in his trial and conviction." In addition to inadequately briefing his claim; see, e.g., *Estate of Rock* v. *University of Connecticut*, 323 Conn. 26, 33, 144 A.3d 420 (2016) ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." (Inter-

State *v.* Rodriguez

See footnote 6 of this opinion. We conclude that the defendant's claim fails under the third prong of *Golding* because he has not established a constitutional violation.

To understand the defendant's claim, we begin with background principles of DNA evidence. DNA evidence consists of two elements: (1) a determination that the defendant's genetic profile matches a genetic profile present in the evidentiary sample, and (2) a statistical calculation of the rarity of that match. See, e.g., *State* v. *Sivri*, 231 Conn. 115, 155, 646 A.2d 169 (1994) (explaining that calculation of rarity of match "generates a ratio which accompanies a match in order to express the statistical likelihood that an unrelated individual chosen at random from a particular population could have the same DNA profile as the suspect" (internal quotation marks omitted)). This is because a match means little without statistical evidence that will allow the fact finder to determine the strength of the match and, thus, the strength of the inferential fact that the defendant is the person whose DNA is present in the actual evidentiary sample. See id., 155–56. Three types of statistical methods, relevant to the defendant's claim, are used to express the rarity of the match: random match probability, combined probability of inclusion, and source probability. Each method describes the rarity of the match in a different way. The random match probability is the probability that the defendant's DNA profile would match the DNA profile of an unrelated member of the general population who is chosen at random. See id., 155; see also *State* v. *Small*, 180 Conn. App. 674, 685, 184 A.3d 816, cert. denied, 328 Conn. 938, 184 A.3d 268 (2018). The combined probability of inclusion is employed when there is a mixed DNA profile, which indicates the presence of genetic material

nal quotation marks omitted.)); the defendant also failed to demonstrate that the jury did not understand the state's DNA evidence.

State *v.* Rodriguez

from two or more contributors. See *Roberts* v. *United States*, 916 A.2d 922, 927 (D.C. 2007). This method "takes all of the observed data and considers all possible profiles that could produce that data. Then, it generates a statistic, which expresses the probability that a random person would have any of those generated profiles." B. Stiffelman, "No Longer the Gold Standard: Probabilistic Genotyping Is Changing the Nature of DNA Evidence in Criminal Trials," 24 Berkeley J. Crim. L. 110, 128 (2019). "Source probability is the probability that someone other than the defendant is the source of the DNA found at the crime scene." (Internal quotation marks omitted.) *State* v. *Small*, supra, 685. Neither the random match probability nor the combined probability of inclusion is a statement of source probability. To conflate either type with source probability is to ascribe a greater degree of certainty that the evidentiary sample contains the defendant's DNA than is warranted based on a proper understanding of the random match probability or the combined probability of inclusion.[13]

Here, the defendant contends that, unless the prosecutor properly explained the DNA evidence to the jury, the jury "would likely believe that a random match probability of 1 in 230,000 is the likelihood that the defendant is not the source of the DNA in the vaginal sample." (Emphasis omitted.) The defendant notes that the prosecutor asked Przech only one question about

---

[13] Conflating the random match probability with source probability is known as the prosecutor's fallacy. See, e.g., *McDaniel* v. *Brown*, 558 U.S. 120, 128, 130 S. Ct. 665, 175 L. Ed. 2d 582 (2010) ("The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample. . . . In other words, if a juror is told [that] the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy." (Citation omitted.)).

State *v.* Rodriguez

the statistical probability of the match, and, on cross-examination, Przech only briefly discussed her probability statement. The defendant contends that, because random match probability was never explained to the jury, and given the likelihood that jurors would misunderstand the DNA identification evidence, the evidence was unreliable and introduced in violation of the due process clause under *Manson* v. *Brathwaite*, supra, 432 U.S. 98. In short, the defendant contends that the jurors likely would have misunderstood Przech's testimony regarding the combined probability of inclusion as indicating source probability rather than random match probability.

The state claims that the defendant is not entitled to *Golding* review of this unpreserved claim because it is evidentiary given that (1) the statistical "evidence, on its face, is neither fundamentally unfair nor materially misleading," (2) "the record offers no suggestion that the jurors were potentially confused about the evidence," and (3) "the defendant makes no claim that the prosecutor mischaracterized or misused the . . . evidence in his closing remarks to the jury." Alternatively, the state claims that the defendant's claim fails the third prong of *Golding* because nothing in the record improperly described random match probability.

Assuming the defendant's claim asserts a constitutional violation and not merely an evidentiary issue, we conclude that the defendant has failed to establish a constitutional violation, and, accordingly, his claim fails under the third prong of *Golding*. Contrary to the defendant's assertions, the December, 2016 report and Przech's corresponding testimony were not unreliable because the jury was presented with evidence that there was a match and the statistical rarity of the match. See *State* v. *Sivri*, supra, 231 Conn. 156 ("because a match between two DNA bands means little without data on probabilities, the calculation of statistical probabilities

State *v.* Rodriguez

is an integral part of the process [of DNA matching]'' (internal quotation marks omitted)). Przech also explained that she used the combined probability of inclusion to determine the rarity of the match between the defendant's buccal swab and the evidentiary sample, and nothing in the record improperly equates random match probability with source probability.

On direct examination, the prosecutor asked Przech to explain the significance of the frequency numbers contained in her December, 2016 report. Przech testified that she employed the combined probability of inclusion. She properly explained that the combined probability of inclusion is a mathematical calculation representing ''the statistical frequency *for anyone that would be included in that profile* . . . .'' (Emphasis added.) She emphasized that the statistical frequency was ''not just for [the defendant], but for someone else [who] could have a different combination of numbers that could also be included in that profile.''

Przech further noted that the DNA that had been extracted from the sperm-rich fraction of the vaginal swabs was a mixture containing DNA of three or more persons. She explained that the laboratory cannot determine when or how recovered DNA is deposited in the place that it is found, and the laboratory does not make DNA derived ''identity statements'' regarding samples. Rather, forensic science examiners compare ''the known profile of whoever it is to the sample'' and ''come up with a conclusion, and then have a statistic that is driven by the [evidentiary] sample, and not by the known [sample].'' Przech agreed with defense counsel that she could say only ''that [the defendant] is a potential contributor and that, as of [December 16, 2016], it was 1 in 230,000 in the Hispanic population as potential contributors.'' Przech did not suggest that the combined probability of inclusion is a statement of source probability.

State *v.* Rodriguez

The parties' closing arguments only indirectly addressed Przech's probability statistics and could not reasonably be viewed as confusing or misleading the jury as to the meaning of the combined probability of inclusion or random match probability. During the state's closing argument, the prosecutor emphasized to the jurors that Przech's testimony regarding the DNA evidence was just one piece of a puzzle and that "[p]utting these puzzle pieces together and deciding whether . . . there's a picture . . . [is] your job, and the judge is going to instruct you on it." Defense counsel reminded the jurors that the laboratory does not make identity statements regarding who is or is not guilty of a crime. Defense counsel also drew the jury's attention to the statistical discrepancies between the September, 2016 and December, 2016 reports.

There is no indication in the record that the jury misunderstood the meaning of the combined probability of inclusion or random match probability. Cf. *State* v. *Pappas*, 256 Conn. 854, 887, 776 A.2d 1091 (2001) (during jury deliberations, jury sent note asking whether DNA from certain evidence was "a match to the [defendant's] known DNA sample" (internal quotation marks omitted)). If the defendant nonetheless believed that the DNA evidence was unreliable, misleading or required a more detailed explanation, he had the opportunity to object to the testimony, cross-examine Przech, present his own expert or other contradictory evidence, and request a jury instruction. See, e.g., id., 889 ("a defendant may offer an opposing expert or, as the defendant here did, use cross-examination to critique the analysis and interpretation of mtDNA evidence"); *State* v. *Haughey*, 124 Conn. App. 58, 75, 3 A.3d 980 ("inconclusive characteristics of the [combined probability of inclusion] method's results were the proper subject for cross-examination"), cert. denied, 299 Conn. 912, 10 A.3d 529 (2010); *State* v. *Lindsey*, Docket No. 02C01-

State *v.* Rodriguez

9804-CR-00110, 1999 WL 1095679, *12 (Tenn. Crim. App. October 28, 1999) ("the defense ably challenged the state's DNA proof through intense, probing cross-examination of the state's expert and presentation of its own expert proof"); cf. *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). Throughout defense counsel's extensive cross-examination of Przech, defense counsel never sought to elicit any additional information regarding the combined probability of inclusion; nor did he present his own statistical evidence or request a jury instruction.

The defendant also contends that, without guidance, the jury was likely to overvalue the DNA evidence and ignore the other types of evidence pointing toward or away from his guilt. One way to address that concern is an instruction to the jury on the need to consider all of the evidence in a case. See, e.g., *State* v. *Pappas*, supra, 256 Conn. 889. Here, despite the fact that the defendant did not request an instruction addressing the DNA evidence, the trial court did instruct the jurors that, "[i]n deciding what the facts are, you must consider all the evidence." The court also instructed the jurors that expert testimony is presented to assist them but that "[n]o such testimony is binding [on] you, and you may disregard the testimony either in whole or in part. It is for you to consider the testimony with the other circumstances in the case and, using your best judgment, determine whether you will give any weight to it . . . ." Finally, the court reminded the jurors that the defendant denies he is the person involved in the assault and instructed them that they "must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime . . . ." In

State *v.* Rodriguez

the absence of evidence to the contrary, we presume that the jury followed the court's instructions. See, e.g., *State* v. *O'Neil*, 261 Conn. 49, 82, 801 A.2d 730 (2002).

Given that Przech properly explained the statistical method she used to determine the rarity of the match, and defense counsel had the opportunity to cross-examine her, present his own statistical evidence, or request a jury instruction on this point, we conclude that the defendant has failed to establish a constitutional violation, and, as such, his claim fails under the third prong of *Golding*.

The defendant also asks us to exercise our supervisory authority to require trial courts to instruct the jury on the meaning of random match probability when DNA evidence is the only evidence identifying the defendant as the perpetrator. In response, the state contends that, "[a]ssuming that this is a claim for relief, as opposed to a suggestion, it is . . . inadequately briefed," and, alternatively, "this request should be denied because . . . DNA was not the only evidence of guilt in this case."

"Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, [although] not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system. Our supervisory powers are invoked only in the

State *v.* Rodriguez

rare circumstance [when] these traditional protections
are inadequate to ensure the fair and just administration
of the courts.'' (Emphasis in original; internal quotation
marks omitted.) *State* v. *Wade*, 297 Conn. 262, 296, 998
A.2d 1114 (2010).

We decline the defendant's invitation to exercise our
supervisory powers in the present case. First, the defen-
dant seeks to require an instruction on random match
probability, but, in this case, Przech relied on the com-
bined probability of inclusion as her statistical method
to determine the rarity of the match. Although the com-
bined probability of inclusion and random match proba-
bility produce similar statistical metrics, given that
random match probability is employed for single source
DNA profiles and the combined probability of inclusion
is employed for mixed DNA profiles, a jury instruction
on random match probability would not have fully
explained the statistical method Przech employed in
this case. Second, there is no indication that the jury
misunderstood Przech's description of the statistical
method that she used to determine the rarity of the DNA
match. Third, as we discuss in part III of this opinion,
contrary to the defendant's suggestion, the DNA evi-
dence in this case is not the only evidence identifying
the defendant as the perpetrator. Finally, the defendant
also fails to explain why this extraordinary remedy is
required and how this issue impacts, not only the integ-
rity of this particular trial, but also the perceived fair-
ness of the judicial system as a whole. See, e.g., *State*
v. *Elson*, 311 Conn. 726, 768, 91 A.3d 862 (2014) (''a
defendant seeking review of an unpreserved claim
under our supervisory authority must demonstrate that
his claim is one that, as a matter of policy, is relevant
to the perceived fairness of the judicial system as a
whole, most typically in that it lends itself to the adop-
tion of a procedural rule that will guide the lower courts
in the administration of justice in all aspects of the

criminal process'' (internal quotation marks omitted)). Accordingly, we decline to invoke our supervisory authority at this time to require trial courts to instruct the jury on the meaning of random match probability.[14]

## III

Finally, we consider the defendant's contention that a random match probability of 1 in 230,000, by itself,

[14] Having reached this conclusion, however, we take this opportunity to emphasize that, in appropriate circumstances, and when the defendant requests it, a trial court may instruct the jury on the meaning of the statistical rarity of a match. Our research has not revealed, and the defendant does not contend, that any jurisdiction—state or federal—has adopted a model instruction on the meaning of random match probability. The need for such an instruction, what information such an instruction might contain, and whether it is proper to give such an instruction, however, have been discussed in academic literature and several cases. See, e.g., *State* v. *Bloom*, 516 N.W.2d 159, 170–71 (Minn. 1994) (Page, J., concurring specially); P. Chaudhuri, "A Right to Rational Juries? How Jury Instructions Create the 'Bionic Juror' in Criminal Proceedings Involving DNA Match Evidence," 105 Cal. L. Rev. 1807, 1850–51 (2017).

Several courts have concluded that the failure to give such an instruction was appropriate because the instruction improperly addressed matters of scientific fact, not legal principles. See, e.g., *State* v. *Paxton*, Docket No. 2 CA-CR 2007-0062, 2008 WL 4551502, *4 (Ariz. App. January 14, 2008); *Stanley* v. *State*, 289 Ga. App. 373, 375–76, 657 S.E.2d 305 (2008); *Keen* v. *Commonwealth*, 24 Va. App. 795, 807–808, 485 S.E.2d 659 (1997).

This court, however, has taken a different view of jury instructions involving scientific facts—specifically, in the context of research disproving common misperceptions about the reliability of eyewitness identification. We determined that, in a given case in which the concerns raised by the scientific evidence were applicable, it would be proper for a trial court to give a cautionary jury instruction on eyewitness identification. See *State* v. *Harris*, 330 Conn. 91, 134–35, 191 A.3d 119 (2018) ("it may be appropriate for the trial court to craft jury instructions to assist the jury in its consideration of [the reliability of eyewitness testimony]"), citing *State* v. *Guilbert*, 306 Conn. 218, 257–58, 49 A.3d 705 (2012); see also *State* v. *Guilbert*, supra, 258 (trial court retains discretion to give "jury instructions on the fallibility of eyewitness identification evidence," provided that "any such instructions should reflect the findings and conclusions of the relevant scientific literature pertaining to the particular variable or variables at issue in the case").

Given that there is no consensus on the proper instruction explaining random match probability, or whether such instruction is appropriate, and that we need not decide this issue to resolve the present case, we leave for another day the question of under what circumstances a jury instruction should be provided and the precise phrasing of that instruction.

State *v.* Rodriguez

is insufficient to prove that he is guilty beyond a reasonable doubt. Specifically, the defendant contends that a random match probability of 1 in 230,000 in the Hispanic population means that there are about ninety Hispanic males over the age of fifteen in the United States who could have contributed a DNA profile to the vaginal sample.[15] The state contends that this "claim is meritless because the evidence establishing the defendant's identity was not based on the DNA evidence alone." Rather, the state contends, "the recordings of the defendant's two interviews with the police provided sufficient additional evidence to establish his guilt beyond a reasonable doubt." We agree with the state.

The defendant concedes that, although he moved for a judgment of acquittal, he did not raise this argument before the trial court. This court, however, "review[s] an unpreserved sufficiency of the evidence claim as though it had been preserved." (Internal quotation marks omitted.) *State* v. *Josephs*, 328 Conn. 21, 35 n.11, 176 A.3d 542 (2018).

In evaluating a claim of evidentiary insufficiency, we "review the evidence and *construe it as favorably as possible with a view toward sustaining the conviction,* and then . . . determine whether, in light of the evidence, the trier of fact could reasonably have reached the conclusion it did reach." (Emphasis in original; internal quotation marks omitted.) *State* v. *Jordan*, 314 Conn. 354, 385, 102 A.3d 1 (2014). A trier of fact is permitted to make reasonable conclusions by "draw-[ing] whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . [These inferences, however] cannot be based

---

[15] The defendant reasons that the 2016 census identified 41.5 million Hispanic people in the United States over the age of fifteen. The defendant assumes that one half of those individuals, 20.75 million, are male. He arrives at the pool of ninety by dividing 20.75 million by 230,000.

State *v.* Rodriguez

on possibilities, surmise or conjecture.'' (Internal quotation marks omitted.) Id.

In the present case, the evidence establishing the identity of the defendant was not based on the DNA evidence alone. In particular, the video recordings of the defendant's two interviews with the police, which were played for the jury, provided additional evidence from which the jury could have concluded that the defendant was one of the perpetrators. The August, 2016 interview established that the defendant was a resident of New Britain at the time of the assault. The video of both the August and December, 2016 interviews also established that, consistent with the victim's description of the perpetrators, the defendant is Hispanic, heavyset, and speaks English.[16]

Jurors also reasonably could have concluded that several of the defendant's statements to the police during the interviews were inconsistent or partial truths influenced by his participation in the crime and evidence of his consciousness of guilt. For example, after denying ever having had a threesome during the first interview, during the second interview, the defendant admitted that he had engaged in threesomes on two occasions. When the detective asked him during the second interview what happened the day the victim

---

[16] Evidence that the defendant lived in New Britain and resembled the victim's description of one of the perpetrators renders the defendant's argument regarding the number of Hispanic males in the United States unpersuasive because the argument erroneously assumes that the group of people in the population that could have contributed to the profile in the evidentiary sample, in this case ninety, are all equally suspect. This is known as the defense fallacy, and it ''understat[es] the tendency of a reported match to strengthen source probability and narrow the group of potential suspects. . . . [T]he real source probability will reflect the relative strength of circumstantial evidence connecting the defendant and other persons with matching DNA to the scene of the crime.'' (Emphasis omitted; footnote omitted.) *United States* v. *Chischilly*, 30 F.3d 1144, 1157 (9th Cir. 1994) (overruled in part on other grounds by *United States* v. *Preston*, 751 F.3d 1008 (9th Cir. 2014)), cert. denied, 513 U.S. 1132, 115 S. Ct. 946, 130 L. Ed. 2d 890 (1995).

State *v.* Rodriguez

reported being assaulted, the defendant abandoned his lack of recollection and offered an account of picking up a man and a woman in his car near an AutoZone in New Britain and engaging in a threesome. The defendant later explained that he could not remember when that occurred or whether it was the same incident the detective was referencing. The defendant's mention of an AutoZone was significant, however, because the jury was presented with evidence that an AutoZone was located in the vicinity of where the victim reported being abducted. Finally, when the detective informed him that, in addition to the assault, the victim stated that she had been robbed of several hundred dollars, the defendant replied with words to the effect of: "That's not me. It's the other guy." The defendant concedes that his inconsistent statements to the police "might be construed as consciousness of guilt evidence . . . ."

We have "repeatedly held that a jury may infer guilt based on consciousness of guilt evidence in conjunction with other evidence . . . ." *State* v. *Davis*, 324 Conn. 782, 797 n.8, 155 A.3d 221 (2017); see also *State* v. *Morelli*, 293 Conn. 147, 154, 976 A.2d 678 (2009) (evidence of consciousness of guilt, along with other evidence, provided sufficient evidence to prove that defendant was under influence of intoxicating liquor, which is essential element of offense of operating motor vehicle while under influence of intoxicating liquor); *State* v. *Groomes*, 232 Conn. 455, 473–74, 656 A.2d 646 (1995) (holding that trial court properly instructed jury that it may use defendant's flight as evidence of consciousness of guilt and as independent, circumstantial evidence of defendant's guilt). Here, that other evidence was the DNA evidence.

Construing the evidence as favorably as possible to sustaining the guilty verdict, we conclude that the state's case did not rest on the DNA evidence alone and that the circumstantial evidence, combined with the DNA evidence, was sufficient for the jury to find

State *v.* Rodriguez

beyond a reasonable doubt that the defendant was one
of the perpetrators of the sexual assault. See, e.g., *State*
v. *Young*, 157 Conn. App. 544, 558–59, 117 A.3d 944
(rejecting defendant's contention that evidence was
insufficient to support conviction based only on DNA
evidence because state's case did not rest on DNA evi-
dence alone), cert. denied, 317 Conn. 922, 118 A.3d
549 (2015).

The judgment is affirmed.

In this opinion the other justices concurred.

KAHN, J., concurring. I agree with and join in full
the majority opinion. I write separately to clarify the
intersection of evidence based on DNA analysis and
the constitutional right to confrontation.

During oral argument, each party was asked which
individuals involved in DNA analysis were required to
testify pursuant to the confrontation clause of the sixth
amendment to the United States constitution, especially
in light of *State* v. *Walker*, 332 Conn. 678, 212 A.3d 1244
(2019). Each party gave a very different response. The
state read *Walker* to stand for the proposition that, to
satisfy the requirements of the confrontation clause,
the state was required to call only the person or persons
who conducted the critical, interpretive part of the DNA
analysis involving the calling of the alleles, which gives
rise to a numerical DNA profile. Furthermore, the state
argued that the technicians involved in the preliminary
stages including extraction, quantitation, and amplifica-
tion are not necessary witnesses. The defendant inter-
preted precedent, including *Walker*, to not only apply
to analysts as described by the state, but also to the
technician who put the DNA sample into the electropho-
resis machine[1] and, potentially, any other person that

---

[1] I refer to the scientific instrument that analyzes the DNA sample as the
electrophoresis machine throughout this concurrence, but I acknowledge
that the instrument may have different names depending on its capabilities.
For example, a laboratory may instead use a genetic analyzer. See, e.g., M.

337 Conn. 175 JULY, 2021 203

State *v.* Rodriguez

could have contaminated the sample at any stage. Although it is certainly not uncommon for opposing parties to interpret precedent differently, the wide gulf between these responses illustrates a continuing uncertainty in this critical area of constitutional rights, despite recent decisions from this court. See, e.g., *State* v. *Lebrick*, 334 Conn. 492, 223 A.3d 333 (2020); *State* v. *Walker*, supra, 678; *State* v. *Sinclair*, 332 Conn. 204, 210 A.3d 509 (2019); *State* v. *Buckland*, 313 Conn. 205, 96 A.3d 1163 (2014), cert. denied, 574 U.S. 1078, 135 S. Ct. 992, 190 L. Ed. 2d 837 (2015); *State* v. *Smith*, 289 Conn. 598, 960 A.2d 993 (2008).

DNA analysis is a powerful tool that has become a staple in both the scientific community and trial courts since DNA fingerprinting was first invented in 1984. See P. Gill et al., "Forensic Application of DNA 'Fingerprints,' " 318 Nature 577, 577 (1985). This methodology allows us to determine—from blood, skin, sweat, semen, hair, or other DNA-containing cells—the likelihood that an individual is reasonably tied to a crime scene, victim, weapon, or other object. A mere four decades ago, the use of DNA sequencing and comparison as an evidentiary tool in the courtroom was not even an option. Since it was first used to convict a Florida defendant of a sexual offense in 1987; see A. Adema, "DNA Fingerprinting Evidence: The Road to Admissibility in California," 26 San Diego L. Rev. 377, 385 and n.52 (1989); *Andrews* v. *State*, 533 So. 2d 841, 842, 850–51 (Fla. App. 1988), review denied, 542 So. 2d 1332 (Fla. 1989); DNA analysis has rapidly evolved to include improved methodologies. It has not only been used in contemporary trials to inculpate defendants, but also to exonerate wrongly convicted individuals who spent years, and even decades, incarcerated. See generally Innocence Project, DNA's Revolutionary Role in Freeing the Inno-

Chin et al., Forensic DNA Evidence: Science and the Law (2019) § 3:4, pp. 3-28 through 3-31. Regardless of its name, the instrument is one that produces raw data regarding the genotype of the DNA sample.

State *v.* Rodriguez

cent (April 18, 2018), available at https://www.inno-cenceproject.org/dna-revolutionary-role-freedom (last visited September 22, 2020).

Although the last forty years have seen rapid evolution of DNA analysis in the field of science, the jurisprudence regarding constitutionally permissible use of DNA evidence has evolved at a more staid pace. Scant binding precedent from the United States Supreme Court, combined with a lack of cohesion and clarity in the available precedent, has resulted in uncertainty in both state and federal jurisdictions. This lack of guidance has not gone unnoticed by this court; see *State* v. *Walker*, supra, 332 Conn. 706 ("[d]ue to the fractured nature of [*Williams* v. *Illinois*, 567 U.S. 50, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012)], courts have struggled to determine the effect of *Williams*, if any, on the legal principles governing confrontation cause claims"); by federal courts of appeals; see *Washington* v. *Griffin*, 876 F.3d 395, 409 (2d Cir. 2017) ("[w]e have already noted the difficulty in identifying a single holding of principle from the several opinions of the fractured *Williams* [c]ourt, using the analytic approach that the Supreme Court recommends"), cert. denied,      U.S.     , 138 S. Ct. 2578, 201 L. Ed. 2d 299 (2018); and even by ideologically distinct members of the United States Supreme Court. See *Stuart* v. *Alabama*,      U.S.     , 139 S. Ct. 36, 37, 202 L. Ed. 2d 414 (2018) (Gorsuch, J., dissenting from the denial of certiorari) ("Respectfully, I believe we owe lower courts struggling to abide our holdings more clarity than we have afforded them in this area. *Williams* imposes on courts with crowded dockets the job of trying to distill holdings on two separate and important issues from four competing opinions. The errors here may be manifest, but they are understandable and they affect courts across the country in cases that regularly recur.").[2]

[2] Justice Sotomayor joined Justice Gorsuch in the dissent from the denial of certiorari.

State *v.* Rodriguez

In an effort to provide comprehensive guidance, this concurrence (1) illustrates the DNA analysis process as described to the United States Supreme Court, (2) details the requirements of the confrontation clause as established by *Crawford*[3] and how it applies to forensic reports for non-DNA substances, and (3) explains which stages of DNA analysis I believe are subject to the requirements of the confrontation clause in light of this court's precedent.

I

DNA ANALYSIS

When *Williams* was before the United States Supreme Court in December, 2011, the New York County District Attorney's Office and the New York City Office of the Chief Medical Examiner (OCME) submitted an amici curiae brief that, in part, described the DNA testing process at the OCME. *Williams* v. *Illinois* (No. 10-8505), United States Supreme Court Briefs, October Term, 2011, Amicus Brief of the New York County District Attorney's Office et al., pp. 7–8. I find their description of DNA analysis as it is performed at the OCME to be informative and reiterate it here in order to provide clear context for the remainder of this concurrence.[4]

"At the OCME, the testing of each item involves five distinct stages, each of which is performed by one or more different persons. The first stage is *evidence examination*, in which a technician (technician 1) examines the sample for biological fluids and takes cuttings for DNA extraction. The second stage is *extraction*, in which a technician (technician 2) adds chemical

---

[3] *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[4] Methodologies vary among types of DNA samples (i.e., single source or mixtures) and analytical labs. This description is intended for illustrative purposes and to serve as a point of comparison based on the character of the activity, regardless of the exact process or technical descriptors employed.

State *v.* Rodriguez

reagents to the sample that break open the cells and free up the DNA so it is accessible for testing. The third stage is *quantitation*, in which a technician (technician 3) measures the amount of DNA that is present in the sample. If there is a sufficient amount of DNA, the testing proceeds to stage four, *amplification*, in which another technician (technician 4) uses a highly automated process to target, tag, and copy [sixteen] specific locations ('loci'), thereby raising them to a detectable level. The fifth stage is *electrophoresis*, or DNA typing, in which two more technicians (technicians 5 and 6) run the amplified DNA through machines that illuminate the tagged areas and separate, label, and display each locus. The result—an electropherogram—is a genetic DNA profile that is ready for comparison. Notably, each technician in stages one through five prepares worksheets contemporaneously with each task that is performed, which enable subsequent reviewers to verify that each step was conducted in accordance with established procedures.'' (Emphasis added.) Id., p. 7; see also M. Chin et al., Forensic DNA Evidence: Science and the Law (2019) § 3:4, pp. 3-20 through 3-35.

The amici also highlighted that ''each case involves the separate testing of a minimum of two different samples (a crime scene sample and a suspect exemplar), and each process requires the participation of at least six different technicians. That means that each case will involve at least [twelve] technicians. Only at the end of these processes does an analyst, who routinely will testify in court about the case, compare the two electropherograms and prepare a report setting forth her conclusions.'' *Williams* v. *Illinois* (No. 10-8505), United States Supreme Court Briefs, supra, pp. 7–8.[5]

[5] The expert witness in *Walker* testified that a similar DNA typing process was used at the laboratory run by the Division of Scientific Services of the Department of Emergency Services and Public Protection. ''She testified that the process involves four steps: (1) extracting DNA from the sample and purifying it of contaminants; (2) quantitating the DNA, i.e., determining the amount of DNA that has been extracted; (3) amplifying the DNA using

337 Conn. 175 JULY, 2021 207

State *v.* Rodriguez

The first four stages described above are conducted by technicians who each complete a discrete step of the DNA sample preparation, following highly proscribed methods. A technician then loads the sample into the electrophoresis machine that, in step five, produces raw data that describe the genotype of the DNA sample. It is at this point that an analyst becomes involved. The analyst uses her skilled judgment—either through manual computation or computer software—to conduct an interpretive analysis of the raw data to call the alleles and generate a numerical DNA profile that is used for comparison. See, e.g., *People* v. *John*, 27 N.Y.3d 294, 300, 52 N.E.3d 1114, 33 N.Y.S.3d 88 (2016). At a minimum, there are two DNA profiles: one generated from an unknown sample—commonly collected from a crime scene, weapon, or victim that potentially came from a then unknown perpetrator—and another from a known sample, commonly DNA collected from a suspect, often via a buccal swab, pursuant to a warrant. The analyst then compares these DNA profiles to determine if they match, which is "measured by a statistic expressing the rarity of that shared profile, known as the random match probability statistic." M. Chin et al., supra, p. 5-1. Ultimately, the analyst states the probability that a person chosen at random from a population of unrelated people will possess a DNA profile that matches the DNA profile collected as evidence. Id.

II

CONFRONTATION CLAUSE

In 2004, the United States Supreme Court rejected the then accepted view "that the [c]onfrontation [c]lause applies of its own force only to in-court testimony, and

a thermal cycler machine, i.e., creating many copies of different regions of the DNA; and (4) interpreting the data generated from these steps and constructing the numerical DNA profile, which consists of a series of numbers to designate the 'alleles.' " *State* v. *Walker*, supra, 332 Conn. 684–85.

State *v.* Rodriguez

that its application to out-of-court statements intro-
duced at trial depends upon the law of [e]vidence
. . . .'' (Internal quotation marks omitted.) *Crawford*
v. *Washington*, 541 U.S. 36, 50–51, 124 S. Ct. 1354, 158
L. Ed. 2d 177 (2004). Instead, the United States Supreme
Court determined that ''[the confrontation clause]
applies to 'witnesses' against the accused—in other
words, those who 'bear testimony.' . . . 'Testimony,' in
turn, is typically '[a] solemn declaration or affirmation
made for the purpose of establishing or proving some
fact.' . . . An accuser who makes a formal statement
to government officers bears testimony in a sense that
a person who makes a casual remark to an acquaintance
does not.'' (Citations omitted.) Id., 51; see also *State* v.
*Walker*, supra, 332 Conn. 690.

This was a sea change in confrontation clause juris-
prudence. Out-of-court statements that were typically
admitted under hearsay exceptions; see, e.g., *Ohio* v.
*Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d
597 (1980); were now constitutionally inadmissible if
they were testimonial. Put another way, even if a state-
ment falls under a valid hearsay exception under the
rules of evidence, it will nonetheless be inadmissible
under the confrontation clause if that statement is tes-
timonial in nature and the defendant's right to cross-
examination remains unsatisfied;[6] hearsay safeguards
are not adequate to protect confrontation clause rights.

When assessing whether a statement is admissible
under the confrontation clause, the first, most basic

---

[6] A defendant's right to cross-examine a witness regarding testimonial
statements may be satisfied in one of two ways. First, the defendant's right
may be satisfied if the witness is available to testify and can be cross-
examined at trial. Second, the defendant's right may be satisfied if the witness
is unavailable to testify at trial but the defendant had a prior opportunity
to cross-examine her or him about the testimonial statements. See *Crawford*
v. *Washington*, supra, 541 U.S. 68. For clarity, this concurrence assumes
that a witness is unavailable and that the defendant has not been afforded
a prior opportunity to cross-examine her or him.

State *v.* Rodriguez

question is whether the witness is available. If the witness is available, then the defendant has an opportunity to cross-examine, thereby satisfying the requirements of the confrontation clause. In addition, if the witness is unavailable but the defendant had a prior opportunity to cross-examine that witness, then the confrontation clause is also satisfied. In those instances, the admissibility of the witness' individual statements, whether testimonial or not, is governed by the rules of evidence. However, if the witness is unavailable and there was no prior opportunity to cross-examine that witness, then the court must determine whether the statement is testimonial. If the statement is not testimonial, then admission of the statement does not violate the confrontation clause and its admissibility is, once again, determined by the rules of evidence. If the statement is testimonial, then its admission violates the confrontation clause and the statement is inadmissible, even if it would otherwise be admissible under the rules of evidence. The entire analysis to determine if the protections offered by the confrontation clause apply turns on what it means for a statement to be *testimonial.*

The United States Supreme Court has described various formulations of this core class of "testimonial" statements, including "[1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ." (Citation omitted; internal quotation marks omitted.) *Crawford* v. *Washington*, supra, 541 U.S. 51–52. The United

210 JULY, 2021 337 Conn. 175

State *v.* Rodriguez

States Supreme Court has held, for example, that interrogations by law enforcement officers solely directed at establishing the facts of a past crime, in order to identify or provide evidence to convict the perpetrator, fall squarely within the class of testimonial hearsay. See *Davis* v. *Washington*, 547 U.S. 813, 826, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006); *Crawford* v. *Washington*, supra, 53. *Crawford*, however, "[left] for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Crawford* v. *Washington*, supra, 68.

Subsequent United States Supreme Court decisions began to clarify what qualified as "testimonial" statements in a piecemeal fashion, each focusing on whether the specific statement at issue was testimonial rather than attempting to provide a comprehensive definition of "testimonial" that could be applied in any type of case. Statements made in the course of a police interrogation, for example, "are nontestimonial when made . . . under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis* v. *Washington*, supra, 547 U.S. 822; see also id., 822 n.1 (noting that this conclusion does not imply "that statements made in the absence of any interrogation are necessarily nontestimonial").

The results of forensic analysis are testimonial when, regardless of the official title on the document, "[t]hey are incontrovertibly a solemn declaration or affirmation made for the purpose of establishing or proving some fact." (Internal quotation marks omitted.) *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 310, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). Under these circumstances, a forensic report provides "the precise testimony the analysts would be expected to provide if called at trial"

State *v.* Rodriguez

and is "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' " Id., 310–11. The absence of an oath, however, "[i]s not dispositive in determining if a statement is testimonial." (Internal quotation marks omitted.) *Bullcoming* v. *New Mexico*, 564 U.S. 647, 664, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011). The formality of a forensic report "suggests its evidentiary purpose," but it is "not the sole touchstone of our primary purpose inquiry . . . ." (Internal quotation marks omitted.) Id., 671 (Sotomayor, J., concurring in part).

From the triumvirate of *Davis*, *Melendez-Diaz*, and *Bullcoming*, we can glean one clear rule: a statement is testimonial when it has the "primary purpose of establish[ing] or prov[ing] past events potentially relevant to a later criminal prosecution." (Internal quotation marks omitted.) Id., 659 n.6 (opinion announcing judgment); *State* v. *Sinclair*, supra, 332 Conn. 220. This doctrine may be applied in a relatively straightforward manner when a single individual makes a statement or a single expert conducts an analysis and issues a forensic report. In such cases, the person who made the statement or authored the report that had the primary purpose of establishing a fact to be used in a criminal prosecution would need to be present at the trial and subject to cross-examination, or, if unavailable for trial, the defendant must have had a previous opportunity to cross-examine the witness regarding the statement. See *Crawford* v. *Washington*, supra, 541 U.S. 68 ("Where testimonial evidence is at issue . . . the [s]ixth [a]mendment demands what the common law required: unavailability and a prior opportunity for cross-examination"). This doctrine, on the other hand, becomes less clear when it is applied to more complicated scientific processes, such as DNA analysis, where multiple technicians complete the procedural steps that produce an amplified DNA sample, an electrophoresis machine gen-

State *v.* Rodriguez

erates raw data based on the sample, and analysts subjectively apply their scientific expertise to interpret the raw data and generate a DNA profile.

## III

## IMPLICATIONS FOR DNA EVIDENCE

The United States Supreme Court addressed forensic analyses, i.e., analysis of seized substances and analysis of blood alcohol content, in *Melendez-Diaz* and *Bullcoming*, and DNA analysis came into the limelight soon after. See, e.g., *Williams* v. *Illinois*, supra, 567 U.S. 50. The complexity of DNA analysis and the uncertainty of how the primary purpose test applied to its myriad discrete analytical steps resulted in severely fractured opinions in *Williams*, a plurality opinion with concurrences and a dissent, and "no clear consensus as to what constitute[s] a testimonial statement in this context." (Internal quotation marks omitted.) *Washington* v. *Griffin*, supra, 876 F.3d 406; see also *Young* v. *United States*, 63 A.3d 1033, 1042–43 (D.C. 2013). Ordinarily, "[w]hen a fragmented [c]ourt decides a case and no single rationale explaining the result enjoys the assent of five [j]ustices, the holding of the [c]ourt may be viewed as the position taken by those members who concurred in the judgments on the narrowest grounds." (Internal quotation marks omitted.) *United States* v. *James*, 712 F.3d 79, 95 (2d Cir. 2013), cert. denied, 572 U.S. 1134, 134 S. Ct. 2660, 189 L. Ed. 2d 208 (2014). "As we recently observed, the court in *Williams* made it impossible to identify the narrowest ground [on which the justices agreed] because the analyses of the various opinions are irreconcilable. . . . Consequently . . . we must rely on Supreme Court precedent before *Williams* to the effect that a statement triggers the protections of the [c]onfrontation [c]lause when it is made with the primary purpose of creating a record for use at a later criminal trial." (Citation omitted; internal quo-

State *v.* Rodriguez

tation marks omitted.) *State* v. *Walker*, supra, 332 Conn.
706; see *State* v. *Sinclair*, supra, 332 Conn. 225; see
also *United States* v. *James*, supra, 95–96.

Despite a lack of clear guidance from *Williams* as
to what aspects of DNA analysis trigger the protections
of the confrontation clause, one common theme has
risen to the surface: "neither *Melendez-Diaz* nor *Bull-
coming* require[s] every witness in the chain of custody
to testify." *State* v. *Buckland*, supra, 313 Conn. 214; see
also *Washington* v. *Griffin*, supra, 876 F.3d 407 ("the
Supreme Court has never held that the [c]onfrontation
[c]lause requires an opportunity to [cross-examine]
each lab analyst involved in the process of generating a
DNA profile and comparing it with another"). *Melendez-
Diaz* made this explicitly clear, stating: "[W]e do not
hold, and it is not the case, that anyone whose testimony
may be relevant in establishing the chain of custody,
authenticity of the sample, or accuracy of the testing
device, must appear in person as part of the prosecu-
tion's case. While . . . [i]t is the obligation of the prose-
cution to establish the chain of custody . . . this does
not mean that everyone who laid hands on the evidence
must be called. . . . [G]aps in the chain [of custody]
normally go to the weight of the evidence rather than
its admissibility." (Citations omitted; internal quotation
marks omitted.) *Melendez-Diaz* v. *Massachusetts*,
supra, 557 U.S. 311 n.1. This court has recently rein-
forced that view, observing that "[not] all analysts who
participate in the process of generating a DNA profile
necessarily must testify," and concluding that "where
the generation of a DNA profile is testimonial, at least
one analyst with the requisite personal knowledge must
testify." (Internal quotation marks omitted.) *State* v.
*Walker*, supra, 332 Conn. 719.

Although trial courts have general guidance that not
every witness must testify, there remains a woeful pau-
city of specificity as to which technicians or analysts

State *v.* Rodriguez

are required to testify under the confrontation clause. In order to provide some clarity as to when and how the confrontation clause applies in such cases, I review the following three types of "statements" that come from the process of DNA analysis: (1) technicians who are involved in the preliminary stages to prepare a sample for analysis, (2) electrophoresis machines that generate raw data, and (3) analysts who apply their expertise to draw conclusions based on the raw data and inculpate—or exculpate—suspects. Of these three categories, it is only the third category of analysts that triggers the protections afforded by the confrontation clause of the sixth amendment.

A

Technicians

Technicians—whether referred to as technicians or analysts in a specific laboratory—are the individuals who start with a known or unknown DNA sample that was collected outside of the laboratory and who thereafter prepare that sample to be placed into an electrophoresis machine. Sample preparation is often conducted by several individuals, each of whom follows detailed standard operating procedures to conduct a discrete step of the process. In many instances, laboratory protocol requires that technicians document their steps in writing for quality control and quality assurance purposes. See, e.g., A.B.A., Standards for Criminal Justice: DNA Evidence (3d Ed. 2007) standard 16-3.2, p. 70. In conducting his or her individual step in the larger sample preparation process, each individual technician is making a narrow "statement," e.g., "I received the sample following the quantification stage conducted by technician X, conducted amplification pursuant to the standard operating procedure of this laboratory, and then provided the amplified sample to technician Y in order for her to load it into the electrophoresis machine." Even when considered together, the cumulative "state-

State *v.* Rodriguez

ment'' of the technicians involved in the preparatory
stages is, at most, that the DNA sample loaded into
the electrophoresis machine was extracted from the
original sample delivered to the laboratory for analysis.

The United States Supreme Court, however, has not
concluded whether the confrontation clause applies to
''statements'' made by technicians. In the absence of
clear guidance, I am persuaded by the plurality in *Williams*, which reasoned that, ''[w]hen lab technicians
are asked to work on the production of a DNA profile,
they often have no idea what the consequences of their
work will be. . . . It is also significant that in many
labs, numerous technicians work on each DNA profile.
. . . When the work of a lab is divided up in such a
way, it is likely that the sole purpose of each technician
is simply to perform his or her task in accordance with
accepted procedures.'' (Citations omitted.) *Williams* v.
*Illinois*, supra, 567 U.S. 85 (plurality opinion); see also
*Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 357
(Kennedy, J., dissenting) (''[l]aboratory analysts who
conduct routine scientific tests are not the kind of con-
ventional witnesses to whom the [c]onfrontation [c]lause
refers''). Even when a technician may have ''mixed
motives''—to simply perform his or her task and to be
a link in the chain that will eventually lead to evidence
that may be used at trial—a court must ''examin[e] the
statements and actions of all participants'' to determine
the primary purpose of a statement. *Michigan* v. *Bry-
ant*, 562 U.S. 344, 368, 370, 131 S. Ct. 1143, 179 L. Ed.
2d 93 (2011). ''*Melendez-Diaz* and *Bullcoming* together
suggest that a laboratory analysis is testimonial *only*
when the circumstances under which the analysis was
prepared, viewed objectively, establish that the primary
purpose of a reasonable analyst in the declarant's posi-
tion would have been to create a record for use at a
later criminal trial'' (Emphasis in original; internal quo-

State *v.* Rodriguez

tation marks omitted.) *Washington* v. *Griffin*, supra, 876 F.3d 405.

In my view, the "statements" made by technicians fall short of providing testimony against the petitioner because, in and of themselves, they do not have the primary purpose of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution" and, therefore, are not subject to the requirements of the confrontation clause. (Internal quotation marks omitted.) *Bullcoming* v. *New Mexico*, supra, 564 U.S. 659 n.6 (opinion announcing judgment).[7] This court has previously indicated its agreement with this reasoning, stating that "the analysts involved in the preliminary testing stages, specifically, the extraction, quantitation or amplification stages, are not necessary witnesses." (Internal quotation marks omitted.) *State* v. *Walker*, supra, 332 Conn. 719; see also *People* v. *John*, supra, 27 N.Y.3d 313 ("[m]ore succinctly, nothing in this record supports the conclusion that the analysts involved in the preliminary testing stages, specifically, the extraction, quantitation or amplification stages, are necessary witnesses").

As statements made by technicians regarding the preparation of samples for DNA analysis constitute nontestimonial hearsay and, therefore, are not subject to the requirements of the confrontation clause, courts should turn to evidentiary rules to determine if those statements are admissible to establish that the DNA loaded into the electrophoresis machine was extracted and analyzed from the known or unknown sample delivered to the laboratory. Requiring the prosecution to establish the chain of custody should, in a typical case,

_____

[7] This scenario is distinguishable from that presented in *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 313. In that case, the statement made by the unavailable analyst that a substance found on the defendant was cocaine, an illegal substance, was itself inculpatory and was an essential fact to be proven at trial. Id.

State *v.* Rodriguez

be sufficient to meet its evidentiary burden for this portion of the DNA analysis. See *State* v. *Rosado*, 107 Conn. App. 517, 532, 945 A.2d 1028, cert. denied, 287 Conn. 919, 951 A.2d 571 (2008). In determining whether the prosecution meets its burden, "[t]he court must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it . . . ." (Internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 685, 31 A.3d 1012 (2011); see also *State* v. *Petitt*, 178 Conn. App. 443, 452, 175 A.3d 1274 (2017) ("[a]s a general rule, it may be said that the prosecution is not required or compelled to prove each and every circumstance in the chain of custody beyond a reasonable doubt; the reasonable doubt must be to the whole evidence and not to a particular fact in the case" (internal quotation marks omitted)), cert. denied, 327 Conn. 1002, 176 A.3d 1195 (2018). In addition, the complexity of DNA itself acts as an inherent check on chain of custody because when an inadvertent error in sample preparation occurs, "any hypothetical missteps of the [technicians] in the multiple stages preliminary to the DNA typing at the electrophoresis stage would result in either no DNA profile or an incomplete DNA profile, or one readily inconsistent with [the known sample]." *People* v. *John*, supra, 27 N.Y.3d 313; see also *Williams* v. *Illinois*, supra, 567 U.S. 86 (plurality opinion) ("it is inconceivable that shoddy lab work would somehow produce a DNA profile that just so happened to have the precise genetic makeup of [the] petitioner").

I do not dismiss concerns that the defendant's goals of cross-examining each technician are "to weed out not only the fraudulent analyst, but the incompetent one as well"; *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 319; and to determine "whether crime labs have properly stored, extracted, and labeled DNA samples, particularly where a single lab contains and tests sam-

State *v.* Rodriguez

ples from the victim, the crime scene, and the accused
. . . .'' (Citation omitted.) *Washington* v. *Griffin*,
supra, 876 F.3d 411 (Katzmann, C. J., concurring). These
concerns, however, are not unique to DNA analysis, but
are common concerns in the authentication of any piece
of physical evidence and are properly addressed through
chain of custody analysis. See, e.g., *State* v. *Coccomo*,
supra, 302 Conn. 694 (establishing chain of custody
for defendant's blood drawn for blood alcohol content
analysis). The mere fact that the physical evidence in
these cases is DNA is not sufficient to subject nontesti-
monial statements to the strictures of the confrontation
clause. See *Bullcoming* v. *New Mexico*, supra, 564 U.S.
669 (Sotomayor, J., concurring in part) (''[w]hen the
primary purpose of a statement is not to create a record
for trial . . . the admissibility of [the] statement is the
concern of state and federal rules of evidence, not the
[c]onfrontation [c]lause'' (citation omitted; internal
quotation marks omitted)). Defendants seeking to elicit
testimony from technicians are not left without recourse,
however; they retain the power to subpoena technicians
to testify about specific aspects of the chain of custody
that the defendant believes cast doubt on its reliability
and, therefore, supports his or her argument that the
DNA that was prepared and loaded in to the electro-
phoresis machine did not originate from the sample
provided to the laboratory. Cf. *Melendez-Diaz* v. *Massa-
chusetts*, supra, 313–14 (''The text of the [sixth amend-
ment] contemplates two classes of witnesses—those
against the defendant and those in his favor. The prose-
cution *must* produce the former; the defendant *may* call
the latter.'' (Emphasis in original; footnote omitted.)).

B

Machine Generated Raw Data

Having concluded that statements made by techni-
cians are nontestimonial and, therefore, not subject to

337 Conn. 175 JULY, 2021 219

State *v.* Rodriguez

the requirements of the confrontation clause, I now turn to the next stage in the DNA analysis: raw data produced by an electrophoresis machine. The United States Supreme Court has not issued a decision directly related to machine generated raw data in this particular context, but its silence provides insight as to how it could resolve this issue. In 2007, the United States Court of Appeals for the Fourth Circuit held that "the raw data generated by the [chromatograph] machines do not constitute 'statements,' and the machines are not 'declarants.' As such, no out-of-court statement implicating the [c]onfrontation [c]lause was admitted into evidence through the [expert testimony]. Any concerns about the reliability of such machine-generated information is addressed through the process of authentication not by hearsay or [c]onfrontation [c]lause analysis." *United States* v. *Washington*, 498 F.3d 225, 231 (4th Cir. 2007), cert. denied, 557 U.S. 934, 129 S. Ct. 2856, 174 L. Ed. 2d 600 (2009). "[T]he petition for certiorari [in *Washington*] was still pending when the [United States Supreme] Court issued *Melendez-Diaz*. Though the [c]ourt granted petitions for certiorari in other cases and remanded them for reconsideration in light of *Melendez-Diaz*, the [United States] Supreme Court denied the petition in *Washington*. In the wake of these various decisions, the [United States Court of Appeals for the] Fourth Circuit has not overruled *Washington*. Several courts have held that *Washington*'s approach is still sound after *Melendez-Diaz*, *Bullcoming*, and *Williams*." (Footnotes omitted.) B. Sites, "Rise of the Machines: Machine-Generated Data and the Confrontation Clause," 16 Colum. Sci. & Tech. L. Rev. 36, 55–56 (2014).

Furthermore, the United States Supreme Court also indicated in *Bullcoming* that its holding did not apply to machine generated raw data. *Bullcoming* v. *New Mexico*, supra, 564 U.S. 660–61; see also id., 673–74

State *v.* Rodriguez

(Sotomayor, J., concurring in part) ("[T]his is not a case in which the [s]tate introduced only [machine generated] results, such as a printout from a gas chromatograph. . . . Thus, we do not decide whether . . . a [s]tate could introduce (assuming an adequate chain of custody foundation) raw data generated by a machine in conjunction with the testimony of an expert witness." (Citation omitted.)) Noting that "the United States Supreme Court has not addressed the issue of whether the introduction of raw data generated by a machine falls within the confines of *Crawford* or *Melendez-Diaz* [and that] [b]oth the majority and the concurrence in *Bullcoming* emphasized . . . that the holding of that case was limited to human statements and actions and did not necessarily apply to raw, machine produced data," this court has held that "machine generated data [are] not subject to the [restriction] imposed by *Crawford*, *Melendez-Diaz*, and *Bullcoming*." *State* v. *Buckland*, supra, 313 Conn. 216, 221.

Other reports and documentation could be offered at trial related to the calibration and maintenance of an electrophoresis machine that are also not subject to the requirements of the confrontation clause. "Maintenance and calibration records fall in the portion of the spectrum in which humans play an active role in the day-to-day operation of machines, but where courts should still have no difficulty concluding that they generally are not subject to the [c]onfrontation [c]lause. . . . Though these records are made as formal assertions that would normally be used for their truth at trial, courts should conclude that they generally will not trigger a [c]onfrontation [c]lause right because the statements in them are not testimonial. Many courts that have considered the issue have come to this conclusion. Maintenance and calibration records, when made as part of a routine process, are created 'to ensure the reliability of such machines—not to secure evidence

State *v.* Rodriguez

for use in any *particular* criminal proceeding. The fact that the scientific test results and the observations of the technicians might be relevant to future prosecutions of *unknown* defendants [is], at most, an ancillary consideration . . . .' '' (Emphasis in original; footnote omitted.) B. Sites, supra, 16 Colum. Sci. & Tech. L. Rev. 76–77, quoting *People* v. *Pealer*, 20 N.Y.3d 447, 455, 985 N.E.2d 903, 962 N.Y.S.2d 592, cert. denied, 571 U.S. 846, 134 S. Ct. 105, 187 L. Ed. 2d 77 (2013); see also *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 311 n.1 (''[a]dditionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records''); *State* v. *Swinton*, 268 Conn. 781, 833–36, 847 A.2d 921 (2004) (error in admission of bite mark overlays created through Adobe Photoshop because state did not present foundation testimony of adequacy of programs did not violate defendant's confrontation rights but, rather, was evidentiary in nature); *People* v. *Pealer*, supra, 456 (''[w]e endorse this [widely held view] and hold that documents pertaining to the routine inspection, maintenance and calibration of breathalyzer machines are nontestimonial under *Crawford* and its progeny'').

C

Analysts

Having concluded that both technicians' ''statements'' and machine generated raw data are not testimonial and, therefore, that their admissibility is governed by the rules of evidence (e.g., chain of custody or authentication) and not the confrontation clause, I now turn to statements made by the third category of witnesses, the analysts. To be clear, I describe analysts as the individuals who take raw data produced by an electrophoresis machine and, applying their scientific training and expertise, make subjective conclusions on the basis of this raw data, which are often referred to

State *v.* Rodriguez

as generating numerical identifiers and/or the calling
of the alleles. See M. Chin et al., supra, § 3:4, pp. 3-31
through 3-35. Once this step has occurred, the resulting
conclusions are referred to as the DNA profile. The
statements made by analysts about how the DNA profile
was developed from the raw data and the conclusions
that can be drawn from the DNA profile—which may
also be included in a written report—are clearly testi-
monial as they have the primary purpose of creating a
record for use at trial that conveys the likelihood that
the source of DNA found at the crime scene came from
the defendant. *State* v. *Walker*, supra, 332 Conn. 710.
This is the step of DNA analysis that is subject to the
strict requirements of the confrontation clause, and
these are the individuals who the prosecution must call
as witnesses. See *People* v. *John*, supra, 27 N.Y.3d 313
("we conclude that it is the generated numerical identifi-
ers and the calling of the alleles at the final stage of
the DNA typing that effectively accuses [the] defendant
of his role in the crime charged").

There could be up to three analysts in even a straight-
forward case involving one known and one unknown
DNA sample: (1) the analyst who develops the DNA
profile for the known sample, (2) the analyst who devel-
ops the DNA profile for the unknown sample,[8] and (3)

[8] The *Williams* plurality, which, for the reasons stated in the body of this
opinion is not binding precedent, concluded that DNA profiles and reports
regarding unknown samples collected from crime scenes or victims are not
testimonial when they are produced before any suspect was identified. In
that case, "[t]he report [on a vaginal swab from a rape victim of an unknown
assailant] was sought not for the purpose of obtaining evidence to be used
against [the] petitioner, who was not even under suspicion at the time, but
for the purpose of finding a rapist who was on the loose. And the profile
that [was produced from the semen on the vaginal swab] was not inherently
inculpatory." *Williams* v. *Illinois*, supra, 567 U.S. 58. (plurality opinion).
This distinction is puzzling. While one purpose of conducting DNA analysis
may be to identify a rapist who is at large, a purpose of at least equal
importance is to generate a DNA profile that will be used at a future criminal
trial once the rapist is apprehended. The DNA profile from the vaginal swab,
or other unknown DNA collected in connection with a crime, will eventually
be the evidence that directly links the defendant to the crime, and, yet, the

State *v.* Rodriguez

the analyst who compares the two DNA profiles to
determine if they match.[9] For cases involving more DNA
samples, the number of analysts could be even greater.
State prosecutors have argued that requiring multiple

---

rationale in *Williams* would exclude DNA profiles of unknown samples
from the requirements of the confrontation clause in all instances in which
there is no identified suspect. For this reason, I am persuaded that the
confrontation clause requirements apply equally to analysts who create DNA
profiles for both known and unknown samples. See id., 135 (Kagan, J.,
dissenting) ("We have previously asked whether a statement was made for
the primary purpose of establishing past events potentially relevant to later
criminal prosecution—in other words, for the purpose of providing evidence.
. . . None of our cases has ever suggested that, in addition, the statement
must be meant to accuse a previously identified individual . . . ." (Citations
omitted; internal quotation marks omitted.)).

[9] The *Williams* plurality concluded that expert testimony regarding state-
ments in a DNA report produced by an outside laboratory, and relied on
by an expert witness in forming his testimony, but when the report itself
was not introduced into evidence, "does not violate the [c]onfrontation
[c]lause because that provision has no application to out-of-court statements
that are not offered to prove the truth of the matter asserted." *Williams* v.
*Illinois*, supra, 567 U.S. 57–58 (plurality opinion). Claiming that the expert
witness did not vouch for the accuracy of the report from the outside
laboratory but, instead, testified that it matched the known profile so that
the fact finder could assess the accuracy of the expert's statement, the
plurality based its conclusion on the long accepted exception to hearsay
evidence that "an expert witness may voice an opinion based on facts
concerning the events at issue in a particular case even if the expert lacks
firsthand knowledge of those facts." Id., 67. Hearsay exceptions, however, do
not satisfy the confrontation clause. "[W]here the testifying expert explicitly
refers to, relies on, or vouches for the accuracy of the other expert's findings,
the testifying expert has introduced out-of-court statements that, if offered
for their truth and are testimonial in nature, are subject to the confrontation
clause." *State* v. *Walker*, supra, 332 Conn. 694; see also *State* v. *Sinclair*,
supra, 332 Conn. 226 ("[B]usiness and public records are generally admissi-
ble absent confrontation not because they qualify under an exception to
the hearsay rules, but because—having been created for the administration
of an entity's affairs and not for the purpose of establishing or proving some
fact at trial—they are not testimonial. . . . Nonetheless, such records will
be deemed testimonial if they were created for the purpose of establishing
or proving some fact at trial." (Citations omitted; internal quotation marks
omitted.)). In situations such as those present in *Williams*, there is "no
plausible reason for the introduction of [the out-of-court] statements other
than to establish their truth." *Williams* v. *Illinois*, supra, 104 (Thomas, J.,
concurring in the judgment).

State *v.* Rodriguez

analysts to testify at a criminal trial is overly burden-
some on a laboratory. See, e.g., *Williams* v. *Illinois*,
supra, 567 U.S. 117–18 (Thomas, J., concurring in the
judgment). It is only the analysts, however, who per-
form the calling of the alleles and compare the DNA
profiles, which, in turn, leads to the accusation against
the defendant, and the defendant's sixth amendment
right to confront his or her accusers outweighs any
burden on the laboratory or the prosecution. "[A] labo-
ratory that uses a . . . multiple-analyst model may
adapt its operation so that a single analyst is qualified
to testify as to the DNA profile testing." *People* v. *John*,
supra, 27 N.Y.3d 313. First, and perhaps most effective,
a laboratory could assign a single analyst to a case to
draw all conclusions that would require testimony to
comply with the confrontation clause, thereby necessi-
tating only a single witness to testify about all DNA
profiles and comparisons at the defendant's trial. Sec-
ond, an analyst could observe the final stage of analysis
for each DNA profile which he or she did not personally
conduct, which would enable him or her to be cross-
examined at trial as to why certain subjective, scientific
decisions were made that led to the specific conclusions
in the DNA profile developed and its comparison.
Finally, in recognition that analysts leave employment,
move away, or regrettably pass away before a case gets
to trial, a testifying analyst could conduct his or her
own, independent analysis of the raw data and draw
independent conclusions about the DNA profiles.[10] See,

_____

[10] This third manner in which to comply with the confrontation clause is
particularly significant when a DNA profile is produced from an unknown
sample and there are no immediately identifiable suspects. In some cases,
it may be years or even decades before a suspect is identified, and then
years from that point until the suspect is arrested, charged, and tried. In
those cases, it is highly likely that the original analyst who created the DNA
profile from the unknown sample is not available to testify, but another
analyst who will testify can use his or her independent analysis to draw
independent conclusions about the DNA profile. See, e.g., *State* v. *Lebrick*,
supra, 334 Conn. 527 (second analyst who did not produce original ballistics
report "applied his training and experience to the sources before him and

State *v.* Rodriguez

e.g., *State* v. *Lebrick*, supra, 334 Conn. 528 ("[w]here [an] [expert witness] present[s] [her] own independent [judgments], rather than merely transmitting testimonial hearsay, and [is] then subject to cross-examination, there is no [c]onfrontation [c]lause violation" (internal quotation marks omitted)); *People* v. *John*, supra, 27 N.Y.3d 315 ("[w]e conclude that an analyst who witnessed, performed or supervised the generation of defendant's DNA profile, or who used his or her independent analysis on the raw data, as opposed to a testifying analyst functioning as a conduit for the conclusions of others, must be available to testify"). Under each of these three scenarios, at least one analyst would be available to testify at trial about the DNA profiles, and a defendant could effectively cross-examine the analyst to elicit details regarding the subjective, scientific decisions that resulted in their development and comparison.[11]

reach[ed] an independent judgment, the basis of which could be tested through cross-examination" (internal quotation marks omitted)); *Young* v. *United States*, supra, 63 A.3d 1049 ("the prosecution may be allowed to call a substitute expert to testify when the original expert who performed the testing is no longer available (through no fault of the government), retesting is not an option, and the original test was documented with sufficient detail for another expert to understand, interpret, and evaluate the results" (internal quotation marks omitted)). In such cases, "neither [the original DNA report] nor any of the statements or conclusions contained therein [are] admitted into evidence, either as an exhibit or through the conduit of [the testifying expert's] live, in-court testimony. . . . [T]he jury [is] not informed of the nature of the reports on which [the testifying witness] relied, who generated the [original DNA] reports, what information they contained, or whether [the testifying expert's] opinions [are] consistent with the [original DNA] reports." *State* v. *Lebrick*, supra, 527.

[11] This application of the confrontation clause to the conclusions of analysts in the final stages of DNA analysis is consistent with this court's conclusions and holding in *State* v. *Walker*, supra, 332 Conn. 678. In that case, the expert witness developed a DNA profile by interpreting raw data generated from DNA extracted from an unknown sample collected from the crime scene, and she conducted the ultimate comparison of that DNA profile with the DNA profile from the known DNA extracted from the defendant's buccal swab. Id., 696. The expert witness "was not, however, involved in the analysis of the buccal swab, which was an essential compo-

State *v.* Rodriguez

## IV

## CONCLUSION

The confrontation clause does not require that evidence be infallible or even reliable, but guarantees a defendant the right to assess the reliability of hearsay statements that are testimonial in nature through cross-examination. See *Williams* v. *Illinois*, supra, 567 U.S. 113 (Thomas, J., concurring in the judgment); *State* v. *Walker*, supra, 332 Conn. 690. Courts around the country have grappled with the application of confrontation clause precedent established by *Melendez-Diaz*, *Bullcoming*, and *Williams* to DNA evidence, and have sought to satisfy a defendant's right to confrontation while sensibly placing some limit on the number of analysts that are necessary to testify at trial. See *Williams* v. *Illinois*, supra, 89 (Breyer, J., concurring); *People* v. *John*, supra, 27 N.Y.3d 314. Despite the sheer number of judges and justices dedicating time and effort to this complex area of the law, a major issue remains: "How does the [c]onfrontation [c]lause apply to crime laboratory reports and underlying technical statements made by laboratory technicians?" *Williams* v. *Illinois*, supra, 89 (Breyer, J., concurring).

While no single opinion from either the United States Supreme Court or this court states in a comprehensive manner which stages of DNA analysis do or do not implicate the confrontation clause, recent decisions from this court clearly dictate that the technicians

---

nent of the comparison making her opinion possible. There was no comparison without the buccal swab analysis. Rather, the known processing group conducted this analysis and provided the resulting DNA profile to [the expert witness] for her to use in her comparison. [The expert witness] neither participated in nor observed this analysis." Id. In addition, "[there was] no evidence contained within the record indicating that the known processing group provided [the expert witness] with the raw machine data generated from the preliminary stages of the analysis such that [she] could independently verify that the DNA profile had accurately been constructed." Id., 696–97.

State *v.* Rodriguez

"involved in the preliminary testing stages, specifically, the extraction, quantitation or amplification stages, are not necessary witnesses [because their statements do not violate the confrontation clause]. . . . Rather, it is the generated numerical identifiers and the calling of the alleles at the final stage of the DNA typing that effectively accuses [the] defendant of his role in the crime charged.'' (Citation omitted; internal quotation marks omitted.) *State* v. *Walker*, supra, 332 Conn. 719. Those witnesses, more specifically, must have personal knowledge relating to the analysis conducted in the calling of the alleles and the comparison of the DNA profiles that result.

For these reasons, I offer the following guidance when applying the confrontation clause to DNA evidence: (1) hearsay statements made by technicians involved in the preliminary stages of sample preparation are nontestimonial and, therefore, not subject to the confrontation clause; (2) machine generated raw data produced by electrophoresis machines are not subject to the confrontation clause; and (3) analysts involved in the calling of the alleles and in generating numerical identifiers to develop a DNA profile for known and unknown samples, as well as analysts who compare those two profiles, are subject to the confrontation clause, and the defendant must have an opportunity to cross-examine these declarants.

For the foregoing reasons, I respectfully concur.